[No. B069234. Second Dist., Div. Two. July 8, 1993.]

LAWRENCE L. BINKLEY, Plaintiff and Respondent, v.
CITY OF LONG BEACH et al., Defendants and Appellants.

**COUNSEL**

John R. Calhoun, City Attorney, and Robert E. Shannon, Assistant City Attorney, for Defendants and Appellants.

Franscell, Strickland, Roberts & Lawrence, Carol D. Janssen and Rodell R. Fick for Plaintiff and Respondent.

## Opinion

**FUKUTO, J.**—Appellants, the City of Long Beach (hereafter the City), and James C. Hankla, City Manager of the City of Long Beach (hereafter Hankla), appeal from the judgment of the superior court granting a peremptory writ of mandamus in favor of respondent, Lawrence L. Binkley, the embattled Chief of Police for the City of Long Beach. The writ set aside appellants' directive of March 2, 1992, confirming an earlier decision by Hankla to remove Binkley from the position of chief of police effective February 14, 1992, and ordered appellants to grant respondent a new administrative appeal hearing in compliance with the Public Safety Officers Procedural Bill of Rights Act (hereafter the Act). (Gov. Code, § 3300 et seq.)[1] The writ further prohibited Hankla from exercising any review authority over the administrative appeal hearing officer's decision or findings of fact. Appellants contend that the administrative appeal process afforded to respondent, an at will employee serving at the pleasure of the city manager, fully complied with the requirements of the Act. We agree and reverse the judgment.

### The Facts

The City is a charter city, governed by the "home rule" provisions of article XI, section 5 of the California Constitution.[2] Under the City's charter, the city manager is charged with the responsibility for the administration of most of the City's departments, including the police department. (Long

---

[1]All statutory references are to the Government Code unless otherwise indicated.

[2]Article XI, section 5 of the California Constitution provides: "(a) It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith. [¶] (b) It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

Beach City Charter, art. III, § 300.)[3] The city manager's powers and duties include the appointment, suspension and removal of all City employees in the unclassified service. (Long Beach City Charter, art. III, § 301.) Department heads, including the chief of police, are members of the unclassified service and serve at the pleasure of the city manager. (Long Beach City Charter, art. XI, § 1102, subd. (a)(5).)

In March 1987, respondent was hired as the Chief of Police for the City. He was given the task of reforming and restoring public confidence in the City's police department, which had acquired a reputation for providing inadequate training, and exercising insufficient control and discipline over its officers.

In early October 1991, during two city council meetings at which law enforcement-related actions were taken, Long Beach City Attorney John Calhoun reportedly made statements to Deputy Police Chief Robert M. Luman, threatening to "have [respondent's] job," in part, because respondent had not spoken with City Attorney Calhoun for more than 10 months. When respondent heard about the threat, he attempted to set up a meeting with Calhoun to discuss the matter but was allegedly informed by the assistant city attorney, Robert Shannon, that it would be "fruitless" to meet with Calhoun at that time.[4]

On December 19, 1991, Hankla invited respondent to his office and asked him to announce his retirement, effective March 1992. Respondent was told that his departure was sought because of complaints by a number of police department commanders about the "element of fear" in respondent's operation of the department.

On December 23, 1991, Hankla personally delivered to respondent a letter stating that recent events had "caused [him] to undertake a full review of [respondent's] performance as Chief of Police." The letter advised respondent that, effective immediately, he was temporarily reassigned from his current position "to a special assignment under [Hankla's] direction at a location to be determined." The letter further stated that "Deputy Chief Ellis will serve as Acting Chief of Police" during the investigation.

---

[3]Under the Long Beach City Charter, the city manager is responsible for the administration of all departments except the city attorney, city auditor, city prosecutor, civil service department, legislative department, harbor department and water department. (Long Beach City Charter, art. III, § 300.)

[4]Respondent asserts that on October 10, 1991, he broached the subject of Calhoun's remarks with Hankla. Hankla purportedly assured respondent that he had already talked to Calhoun, who was having problems with several City staff members, and had advised him that the "stupid" statements should not have been made.

On January 10, 1992, Assistant City Attorney Shannon confirmed and advised respondent's attorney of a meeting with Hankla scheduled for Monday, January 13, 1992, in the Docent's Library at Rancho Los Alamitos. The letter stated, in relevant part: "This meeting is *not* a Skelly hearing, nor is the Chief entitled to such a hearing. However, he will be given an opportunity to respond to the allegations set forth in the attached document. As we have previously indicated, the investigation of these allegations forms a part of the total performance review of your client. Chief Binkley will further have an opportunity to discuss the more general allegations that his management policies and practices have contributed to the destruction of morale in the Police Department in general and his Command staff in particular."

Attached to the January 10th letter was a list of specific allegations of misconduct by respondent, as follows:

(1) Initiation of sub rosa investigations on an elected City public official without authorization or notification to the city manager;

(2) Unauthorized hiring of and payment to retired police officers as undercover agents to investigate a City public official;

(3) Encouragement of command officers to file stress-related pension claims;

(4) Accusing the city manager of wrongful action in a personnel matter, i.e., that he reduced the proposed discipline of Officer J. Ponce because of a personal/business relationship, and making disparaging statements regarding the city manager's continued employment of Officer Ponce;

(5) Directing subordinates not to communicate with the director of human resources in a matter in which such communication was necessary to ensure adherence to City policy;

(6) Directing subordinates not to seek the advice of the city attorney, or to ignore advice after it was given, regarding matters in which adherence to the legal advice of that office was necessary and appropriate;

(7) Unauthorized use of a police helicopter to transport respondent to a social function while he was off duty.

On January 13, 1992, respondent and his attorney met with Hankla, Assistant City Attorney Shannon, and an investigator. Respondent was

questioned and gave statements in response to the list of allegations of misconduct.

On January 17, 1992, respondent was informed in writing that following a full review of respondent's performance as chief of police, Hankla was "satisfied that there is not sufficient evidence to conclude that you have engaged in any act of wrongdoing." The letter further stated: "However, I have, in the course of this review, discovered instances in which you have exercised questionable judgment. Further, a substantial number of your command staff have come forward to criticize your leadership, and you have, by your actions, subjected yourself to criticism from City management. As a consequence, I have lost confidence in your ability to lead the Long Beach Police Department. I am, therefore, removing you from the position of Chief of Police."

The letter advised that, because of respondent's significant past accomplishments, he would be permitted to remain on special assignment until February 14, 1992, during which time he would continue to receive full pay and benefits, including use of his City vehicle.

On February 14, 1992, Hankla sent a letter acknowledging respondent's readiness to proceed with an appeal hearing. The letter identified Dr. Judson Schoendorf as the person selected by Hankla to conduct the scheduled appeal hearing, and included a summary of the six findings, and the supporting evidence upon which Hankla's decision to remove respondent was based. The list of allegations found by Hankla to be true included: (1) that respondent exhibited a pattern of leadership/management which resulted in the destruction of morale in his command staff; (2) that respondent made disparaging remarks about Hankla regarding his continued employment of Officer J. Ponce, and accused Hankla of reducing Ponce's recommended discipline because of a family business relationship; (3) that respondent initiated and sustained sub rosa investigations of elected City officials without notification to or authorization from Hankla; (4) that respondent conducted an investigation into the activities of the assistant city manager without authorization by Hankla; (5) that respondent ordered staff not to communicate with the director of human resources regarding matters in which communication was necessary to ensure adherence to City policy; and (6) that, without authorization or notification to Hankla, respondent ordered a police helicopter to transport him to and from a social function while he was off duty.

The letter advised respondent that, at the administrative appeal hearing, he would "be given an opportunity to establish a formal record of the evidence

which would either tend to show that the allegations are false or that mitigating circumstances should be taken into consideration." Thereafter, the letter advised, Dr. Schoendorf would direct a report to Hankla advising him of his factual findings. However, Hankla was to retain "the final decision making authority pursuant to [his] responsibilities under the Charter."

Respondent's administrative appeal hearing was heard by Dr. Schoendorf on February 27, 1992. Only respondent testified at the hearing.

Respondent objected to the limited scope of the hearing, and Hankla's retention of final decisionmaking authority, as outlined in Hankla's letter of February 14, 1992. He demanded, but was refused the opportunity to cross-examine the individuals whose statements formed the evidentiary basis for Hankla's findings of misconduct. Respondent further objected that he was being punished for appealing his discharge as evidenced by the fact that Hankla found insufficient evidence of wrongdoing prior to respondent's invocation of the right to appeal, but was forcing respondent to defend against the same charges of wrongdoing during the appeal hearing.

On February 28, 1992, Dr. Schoendorf issued his written findings, in summary, as follows: (1) that respondent had done an excellent job as a "Reform Chief" bringing major improvements to the police department, but his inability to change his management style to become less hierarchical had led to significant destruction of morale in the department; (2) that respondent did maintain sub rosa investigations of elected City officials without notifying the city manager; (3) that respondent had problems dealing with certain City officers and should have discussed those problems with the city manager, rather than conveying concerns to command staff, who perceived that they were not to communicate with certain City departments and officials; and (4) that respondent's use of a police helicopter did not violate any rule or regulation, but was "perhaps" not politically astute, without the city manager's authorization. Dr. Schoendorf concluded that the decision to discharge respondent should be sustained based upon the "breach in morale," as well as "differences in leadership and management style."

On March 2, 1992, respondent was advised by letter that Hankla had received and fully reviewed the report of Dr. Schoendorf, and that Hankla's decision to remove him from the position of chief of police, effective February 14, 1992, remained unchanged.

Respondent filed a petition for writ of administrative mandamus seeking orders, inter alia, setting aside Hankla's March 2, 1992, directive, and compelling a new administrative appeal hearing before an independent

hearing officer. Following a hearing on June 30, 1992, the superior court found that appellants had failed "[i]n every respect" to comply with the Act (§ 3300 et seq.) and granted the writ.

*Discussion*

■ As the title suggests, the Public Safety Officers Procedural Bill of Rights Act provides a catalogue of basic rights and protections which must be afforded all peace officers by the public entities which employ them. (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 135 [185 Cal.Rptr. 232, 649 P.2d 874] [*Baggett*].)[5] The Act bespeaks the Legislature's determination that, because labor unrest and strikes produce consequences extending far beyond local boundaries, the maintenance of stable employment relations between peace officers and their employers is a matter of statewide concern. (§ 3301; *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 567 [7 Cal.Rptr.2d 531, 828 P.2d 672] [*Burden*]; *Baggett, supra*, at pp. 136-139.)

In *Baggett, supra*, 32 Cal.3d 128, the Supreme Court considered whether the application of the Act to charter cities violated the "home rule" provisions of the California Constitution (Cal. Const., art. XI, § 5). The high court concluded that the Act's minimal infringement of the city's implied power to determine the manner in which its employees could be removed was not unconstitutional. (*Baggett, supra*, at pp. 138-140.)

Later, in *Gray, supra*, 224 Cal.App.3d 621, the Court of Appeal squarely addressed the applicability of the Act to a city police chief serving at the pleasure of a city manager. The appellate court held that police chiefs were "public safety officers" entitled to administrative appeal under section 3304, subdivision (b) of the Act.

In the instant matter, respondent was granted an administrative appeal hearing, but the superior court found that the hearing was inadequate to

---

[5]In summary, the Act: (1) secures to public safety officers the right to engage in political activity, when off duty and out of uniform, and to seek election to or serve as a member of the governing board of a school district (§ 3302); (2) prescribes certain protections which must be afforded officers during interrogations which could lead to punitive action (§ 3303); (3) gives the right to review and respond in writing to adverse comments entered in an officer's personnel file (§§ 3305, 3306); (4) provides that officers may not be compelled to submit to polygraph examinations (§ 3307); (5) prohibits searches of officers' personal storage spaces or lockers except under specified circumstances (§ 3309); (6) limits the circumstances under which officers may be forced to disclose their personal financial circumstances (§ 3308); (7) gives officers the right to administrative appeal when any punitive action is taken against them, or they are denied promotion on grounds other than merit (§ 3304); and (8) protects officers against retaliation for the exercise of any right conferred by the Act (§ 3302). (32 Cal.3d at p. 135; *Gray* v. *City of Gustine* (1990) 224 Cal.App.3d 621, 625-626 [273 Cal.Rptr. 730] [*Gray*].)

comply with section 3304 of the Act. Section 3304 provides, in relevant part, that: "(a) No public safety officer shall be subjected to punitive action, or denied promotion, or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter, or the exercise of any rights under any existing administrative grievance procedure. . . . [¶] (b) No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency without providing the public safety officer with an opportunity for administrative appeal."

Not only do appellants contend that the administrative appeal fully complied with section 3304 of the Act, they further assert that the superior court's order, prohibiting Hankla from exercising any review authority over the administrative appeal hearing officer's decision or findings of fact, violates the "home rule" provision of the California Constitution (Cal. Const., art. XI, § 5) by abrogating the city manager's authority under the City's Charter, to appoint, suspend and remove, at will, his department heads, including the police chief. In determining the scope of coverage under the Act, we independently determine the proper interpretation of the statute and are not bound by the lower court's interpretation. (*Burden, supra*, 2 Cal.4th at p. 562.)

At the outset we note that the Act was not intended to interfere with a charter city's right to regulate peace officers' qualifications for employment, or the causes for which they may be removed. (*Baggett, supra*, 32 Cal.3d at p. 138.) Nor was the Act intended to abrogate the powers granted charter cities by article XI, section 5 of the California Constitution (*Holcomb v. City of Los Angeles* (1989) 210 Cal.App.3d 1560, 1568 [259 Cal.Rptr. 1]), including the right to terminate a peace officer's employment at will, without a showing of "just cause." (*Browning v. Block* (1985) 175 Cal.App.3d 423, 430 [220 Cal.Rptr. 763] [*Browning*]; *Barnes v. Personnel Department* (1978) 87 Cal.App.3d 502, 506 [151 Cal.Rptr. 94] [*Barnes*].) The limited purpose of an administrative appeal under section 3304 is to give the peace officer subjected to punitive action an opportunity "to establish a formal record of the circumstance surrounding his termination" (87 Cal.App.3d at p. 506) and "to attempt to convince the employing agency to reverse its decision, either by demonstrating the falsity of charges which led to punitive action, or through proof of mitigating circumstances." (*Browning, supra*, at p. 430.)

Section 3304 requires only that an *opportunity* for administrative appeal be provided. It does not specify how the appeal process is to be implemented. (*Browning, supra*, 175 Cal.App.3d at p. 429.) The details of administrative appeal under section 3304, subdivision (b) are left to be formulated by the local agency. (*Stanton v. City of West Sacramento* (1991)

226 Cal.App.3d 1438, 1443 [277 Cal.Rptr. 478].) Where, as here, the terminated employee serves at the pleasure of a city manager, and the scope of administrative appeal hearing is not prescribed by personnel rules, agency regulations, memoranda of understanding, or customary agency practices, the adequacy of the appeal procedure afforded must be measured according to constitutional due process principles. (*Gray, supra,* 224 Cal.App.3d at pp. 628-632.)

Decisions of the United States Supreme Court underscore the fact that due process is flexible and calls for such procedural protections as a particular situation demands. (*Mathews* v. *Eldridge* (1976) 424 U.S. 319, 334 [47 L.Ed.2d 18, 32-33, 96 S.Ct. 893].) Three distinct factors must be considered: the private interest that will be affected by the official action; the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and the government's interest, including the function involved and the fiscal and adminis-trative burdens entailed by imposing additional procedural requirements. (*Id.* at pp. 334-335 [33 L.Ed.2d at pp. 32-34].)

▮ Respondent's right to a hearing arises because his removal from the position of chief of police was initiated based on charges of misconduct, mismanagement, and misjudgment. We must realistically assume that such allegations would have a tendency to stigmatize respondent's reputation and impair his ability to take advantage of other employment opportunities in law enforcement administration. (*Murden* v. *County of Sacramento* (1984) 160 Cal.App.3d 302, 308-309 [206 Cal.Rptr. 699] [*Murden*]; *Lubey* v. *City and County of San Francisco* (1979) 98 Cal.App.3d 340, 347 [159 Cal.Rptr. 440].) Because a protected "liberty" interest is implicated, due process requires, at minimum, that he be given an opportunity to refute the charges and clear his name. (*Gray, supra,* 224 Cal.App.3d at p. 629; *Murden, supra,* 160 Cal.App.3d at p. 309; see also *Codd* v. *Velger* (1977) 429 U.S. 624, 627 [51 L.Ed.2d 92, 96-97, 97 S.Ct. 882]; *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 573, fn. 12 [33 L.Ed.2d 548, 558-559, 92 S.Ct. 2701] [*Board of Regents*].)

Appellants, of course, contend that the requirements of due process as well as section 3304 were satisfied by the pre- and post-termination name-clearing hearings afforded, and that the trial court's contrary finding stems from an unnecessarily expansive interpretation of the rights conferred by the Act. Respondent, on the other hand, seeks to demonstrate the constitutional inadequacy of the procedures employed.

▮ Among other alleged defects in the appeal procedure, respondent points to the fact that he was relieved of the duties of his office, placed on

temporary, nonexistent assignment, and replaced by an acting police chief, without a *Skelly*-type pretermination hearing.[6] However, the Supreme Court of this state has held that *Skelly* procedural rights are inapplicable to government employees holding "at will" administrative positions, who have no constitutionally protected property interest in continued employment. (*Barthuli v. Board of Trustees* (1977) 19 Cal.3d 717, 722-723 [139 Cal.Rptr. 627, 566 P.2d 261]; *Board of Regents, supra*, 408 U.S. at pp. 576-577 [33 L.Ed.2d at pp. 560-561].) The United States Supreme Court is in accord. When the sole purpose of an administrative appeal procedure is to afford a discharged government employee an opportunity to clear his name, a hearing "after the actual dismissal is a sufficient compliance with the requirements with the Due Process Clause." (*Arnett v. Kennedy* (1974) 416 U.S. 134, 157 [40 L.Ed.2d 15, 35, 94 S.Ct. 1633]; see also *Murden, supra*, 160 Cal.App.3d at p. 310.)

Even were we to assume respondent was entitled to "some kind of a hearing" before being deprived of a "protected interest" (*Board of Regents, supra*, 408 U.S. at p. 570, fn. 7 [33 L.Ed.2d at pp. 556-557]), no deprivation of a constitutionally protected "liberty" interest occurred until the stigmatizing allegations of mismanagement and misconduct led to the decision to terminate his employment. (*Codd v. Velger, supra*, 429 U.S. at p. 628 [51 L.Ed.2d at p. 97]; *Paul v. Davis* (1976) 424 U.S. 693, 706 [47 L.Ed.2d 405, 416-417, 96 S.Ct. 1155].) Respondent continued to receive full pay and benefits of the office of chief of police during the pendency of the city manager's investigation. He received notice of the charges under investigation and an opportunity to respond to the decisionmaking authority, in person, before the effective date of termination, February 14, 1992. Therefore, a *Skelly*-type pretermination hearing was in fact held, whether or not required. (*Murden, supra*, 160 Cal.App.3d at pp. 309-310; *Skelly, supra*, 15 Cal.3d at p. 215; see also *Board of Regents, supra*, 408 U.S. at p. 570, fn. 7 [33 L.Ed.2d at pp. 556-557].)

■ Respondent maintains that he was denied due process, and the trial court so found, because he was denied the right to cross-examine his accusers, and forced to assume the burden of disproving the "spurious" allegations against him at the administrative appeal hearing. As evidence of the latter charge, he points to Hankla's letter of February 14, 1992, which purportedly places the burden on respondent "to establish a formal record of the circumstances surrounding [his] termination and to produce evidence which would either tend to show that the allegations are false or that mitigating circumstances should be taken into consideration."

---

[6]See *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774] (*Skelly*).

Respondent cites *Parker* v. *City of Fountain Valley* (1981) 127 Cal.App.3d 99 [179 Cal.Rptr. 351] in support of the proposition that he was improperly forced to carry the burden of proof and the burden of producing evidence, and denied cross-examination rights. The case is inapposite. In *Parker*, the defendant city dismissed a rank and file police sergeant—"a 'tenured' employee who could be removed from his position only for cause." (*Id.* at p. 106.) The applicable administrative appeal rules expressly provided a right of cross-examination, but placed the burden of proof on the party seeking to appeal the decision of the department head, and, the plaintiff was compelled to present evidence sufficient to disprove the charges before the city was required to present any evidence at the administrative appeal hearing.

By contrast, respondent held the position of police chief at the pleasure of the city manager. The city manager was free to discharge him without "just cause," so long as he was given an adequate opportunity to "convince the employing agency to reverse its decision." (*Browning, supra,* 175 Cal.App.3d at p. 430; *Board of Regents, supra,* 408 U.S. at p. 573, fn. 12 [33 L.Ed.2d at pp. 558-559].) Accordingly, Hankla's February 14th letter did not improperly shift the burden of proof to respondent. Rather, it accurately apprised respondent of his limited right, as a public employee serving at the pleasure of the city manager, to a hearing to "establish a formal record of the circumstance surrounding his termination" (*Barnes, supra,* 87 Cal.App.3d at p. 506) and "to convince the employing agency to reverse its decision, either by demonstrating the falsity of charges which led to punitive action, or through proof of mitigating circumstances." (*Browning, supra,* at p. 430.)

Respondent has failed to cite a single case which supports his claim that due process mandates that he be given an opportunity to confront and cross-examine the witnesses at a trial-type, evidentiary hearing. Neither *Gray* nor *Browning* nor *Lubey*—which discuss the right to administrative appeal in the context of peace officers serving in various "at will" positions —states or implies that such officers have the right of confrontation guaranteed by the Act or the due process clause. There is, however, authority supporting the position taken by appellants, that there is no right of cross-examination at a name-clearing hearing. (*Murden, supra,* 160 Cal.App.3d at p. 311; *Mathews* v. *Eldridge, supra,* 424 U.S. at p. 348 [47 L.Ed.2d at p. 41].)

■ Respondent also defends the trial court's ruling on the ground that the appeal process was biased. As indicia of the biased nature of the procedure, he points to the fact that the hearing examiner was appointed by the city manager, received advice from the city attorney, and his decision on appeal could be disregarded or overridden by the city manager, who retained ultimate power. Once again, the cases cited by respondent are readily distinguishable.

In *Gray, supra,* for example, the administrative appeal hearing was held before the city manager who discharged the chief of police. According to the appeal procedure offered, the city manager was to hear the chief's evidence, and make a recommendation to the city council regarding his continued employment. (224 Cal.App.3d at p. 631.) The police chief refused to submit to the procedure. The Court of Appeal found that the administrative appeal offered was clearly inadequate because the city manager was "embroiled in the controversy" and did not constitute a neutral fact finder. *(Ibid.)*

In this case, respondent was afforded a factfinding hearing before a professional hearing examiner. He initially questioned the neutrality of Dr. Schoendorf, because he was selected by the city manager, but received assurances that the hearing examiner had little personal knowledge of and had not prejudged the case, and had been chosen solely because of his experience performing civil service commission hearings once per week for a period of eight years. When respondent's counsel expressed concern that Assistant City Attorney Shannon appeared to be giving Dr. Schoendorf advice, he was assured that Shannon's role was that of counsel for the city manager, and that Dr. Schoendorf would be determining what course of action to take from the evidence. At the conclusion of the hearing, respondent's counsel commented favorably on the fair manner in which the administrative appeal hearing had been conducted.

■■■ As the Court of Appeal stated in *Gray, supra:* "Bias and prejudice are not implied and must be clearly established. A party's unilateral perception of bias cannot alone serve as a basis for disqualification. Prejudice must be shown against a particular party and it must be significant enough to impair the adjudicator's impartiality. The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice." (224 Cal.App.3d at p. 632.)

No facts appear in the instant record supporting a claim that the respondent's administrative appeal hearing officer was biased. There is nothing to indicate that Dr. Schoendorf had a personal or financial stake in the matter, or that he harbored any animosity toward respondent. *(Murden, supra,* 160 Cal.App.3d at p. 312.) Evidence is also lacking that respondent's hearing examiner was one of a "seamless web of officials out to get him." *(Doyle* v. *City of Chino* (1981) 117 Cal.App.3d 673, 682 [172 Cal.Rptr. 844].) Respondent was not precluded from conducting his own investigation and, at the hearing, he was given ample opportunity to present his own evidence. Accordingly, Dr. Schoendorf is entitled to the benefit of the presumption that he was a person " 'of conscience and intellectual discipline' " and judged respondent's case fairly based on the evidence. *(Withrow* v. *Larkin* (1975) 421 U.S. 35, 55 [43 L.Ed.2d 712, 728, 95 S.Ct. 1456].)

We also reject the assertion that due process was offended by the city manager's retention of final decisionmaking authority under the city charter. It has been held that "the right to a fair and impartial tribunal is not violated by permitting the official who makes the initial disciplinary decision to have the final say in the matter." (*Burrell* v. *City of Los Angeles* (1989) 209 Cal.App.3d 568, 579 [257 Cal.Rptr. 427].) Likewise, the United States Supreme Court has declared: "Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons." (*Board of Regents, supra,* 408 U.S. at p. 573, fn. 12 [33 L.Ed.2d at pp. 558-559].) In any event, Dr. Schoendorf *sustained* the decision of the city manager, making it unnecessary for him to disregard or override the decision rendered on appeal.

Respondent further argues that the procedure was biased by virtue of the fact that the city manager and city attorney participated in the pretermination investigation. The combination of adjudicative and investigative functions, without more, does not offend due process. (*Withrow* v. *Larkin, supra,* 421 U.S. at p. 47 [43 L.Ed.2d at pp. 723-724].)

We are persuaded that the trial court's construction of section 3304 of the Act unnecessarily eviscerates the city manager's charter-endowed power to appoint, suspend, and remove, without cause, his department heads (Long Beach City Charter, art. III, § 301; *id.,* art. XI, § 1102, subd. (a)(5)). Accordingly, we agree with appellants that the trial court's order, prohibiting Hankla from retaining "final decision making authority" under the City's Charter resulted in a violation of the "home rule" provisions of our state Constitution (Cal. Const., art. XI, § 5). The statewide interest in the maintenance of stable relations between public safety officers and their employers was adequately served by granting respondent notice of the charges, an opportunity to respond to the city manager's charges, and a posttermination hearing to clear his name, before a neutral fact finder. (*Baggett, supra,* 32 Cal.3d at pp. 136-138.)

Accordingly, the orders under review are reversed. Parties are to bear their own costs on appeal.

Boren, P. J., and Gates, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 21, 1993.