[No. B077854. Second Dist., Div. Two. June 21, 1995.]

LOS ANGELES POLICE PROTECTIVE LEAGUE et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

1536

## COUNSEL

James K. Hahn, City Attorney, Frederick N. Merkin and Leslie E. Brown, Assistant City Attorneys, for Defendants and Appellants.

Gregory G. Petersen and Larry J. Roberts for Plaintiffs and Respondents.

## OPINION

**BOREN, P. J.**—State law protects public safety officers from being compelled to submit to polygraph examinations against their will. (Gov. Code. § 3307.)[1] We conclude that a city police department may require a polygraph examination for officers who voluntarily seek to be promoted or transferred into a few specialized divisions where the work is unusually sensitive and requires the highest level of integrity. Under these circumstances, the polygraph requirement offends neither statutory law nor constitutional privacy rights.

---

[1] All future statutory references are to the Government Code, unless otherwise indicated.

FACTS

In January of 1992, the Los Angeles Police Protective League (the League) filed a complaint seeking declaratory and injunctive relief on behalf of its members. The League alleges that the City of Los Angeles (the City) is compelling police department employees to submit to polygraph examinations as a condition of obtaining transfer opportunities that offer higher pay. Asserting that the polygraph requirement violates state constitutional and statutory provisions, the League seeks a declaration that the City's polygraph procedures are illegal, and an order enjoining any further use of the polygraph.

The polygraph tests are administered as part of the screening process for applicants to some of the police department's divisions. Specifically, the polygraph requirement applies to positions in the antiterrorist division, the organized crime intelligence division, the administrative vice division and the administrative narcotics division (the affected divisions). Positions in the affected divisions are sensitive assignments which require careful screening of applicants. According to former Police Chief Darryl Gates, "Those are the assignments where greatest likelihood of breaches of integrity can occur and greatest amount of damage can occur when there is a breach of integrity in any one of those assignments." Applicants are warned in advance of the polygraph requirement.

Initially failing a polygraph examination does not necessarily disqualify an applicant from securing a position in the affected divisions. Those who fail are permitted to discuss the results with the examiner, then retake the examination. Some people who retake the examination are hired by the affected divisions. Even people whose test results show "deceptive" qualities have been hired. Generally, however, individuals who fail the polygraph are not hired in the affected divisions. Candidates who fail may meet with division commanders to discuss why the results were unfair and should be disregarded. The polygraph is one part of the background examination for applicants to the affected divisions. The polygraph will raise a red flag and allow the background investigator to zero in on a specific issue.[2] None of the departmental employees associated with the polygraph testing could recall

---

[2]The questions asked during the examination are standardized, and all relate to the particular position for which a candidate has applied. For example, an officer who wishes to work in the narcotics section would be questioned about narcotics usage, contacts with places where narcotics are sold, trafficking, and willingness to release confidential information for personal gain or profit. Similarly, antiterrorist division polygraphs are geared toward participation in subversive activities. Candidates are not asked about personal matters such as sexual preference, for example, which are irrelevant to their jobs.

candidates for the positions in the affected divisions ever refusing to take a polygraph test or objecting to its administration.

On June 18, 1993, the trial court granted a preliminary injunction preventing the use of polygraph examinations to investigate personnel seeking transfer opportunities to the affected divisions. This appeal was filed on August 11, 1993.

## DISCUSSION

### 1. *Judicial Review*

The Public Safety Officers Procedural Bill of Rights Act (§ 3300 et seq.) (the Act) gives the superior court initial jurisdiction over alleged violations of its provisions, and allows the court to issue restraining orders or preliminary or permanent injunctions to prevent future violations. (§ 3309.5, subds. (b), (c).) An order granting a preliminary injunction is appealable. (Code Civ. Proc., § 904.1, subd. (a)(6); *Thornton* v. *Carlson* (1992) 4 Cal.App.4th 1249, 1255, fn. 5 [6 Cal.Rptr.2d 375].) ■ On appeal, the reviewing court independently determines the meaning of the Act, and is not bound by the trial court's interpretation. (*Binkley* v. *City of Long Beach* (1993) 16 Cal.App.4th 1795, 1806 [20 Cal.Rptr.2d 903].)

### 2. *Purpose of the Act*

The express legislative purpose of the Act is to ensure "stable employer-employee relations[ ] between public safety employees and their employers." (§ 3301.) It is unlawful for a public safety department to deny public safety officers the rights and protections guaranteed to them by the Act. (§ 3309.5, subd. (a).)

■ By the same token, as this court recently observed, "the Act was not intended to interfere with a charter city's right to regulate peace officers' qualifications for employment, or the causes for which they may be removed." (*Binkley* v. *City of Long Beach, supra,* 16 Cal.App.4th 1795, 1806, citing *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 138 [185 Cal.Rptr. 232, 649 P.2d 874].) "[T]he Bill of Rights Act is not intended to regulate or restrict the appointment of police officers by local law enforcement agencies." (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 566 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

Though the Act does not interfere with a locality's hiring decisions, it does impinge upon a public employer's firing decisions, or other punitive

acts: "[T]here can be no doubt that the act is concerned primarily with affording individual police officers certain procedural rights during the course of proceedings which might lead to the imposition of penalties against them." (*White* v. *County of Sacramento* (1982) 31 Cal.3d 676 [183 Cal.Rptr. 520, 681, 646 P.2d 191] citing, among other statutes, the ban on polygraphs in § 3307.)

### 3. *Application of Section 3307*

Section 3307 of the Act provides as follows: "No public safety officer shall be compelled to submit to a polygraph examination against his will. No disciplinary action or other recrimination shall be taken against a public safety officer refusing to submit to a polygraph examination, nor shall any comment be entered anywhere in the investigator's notes or anywhere else that the public safety officer refused to take a polygraph examination, nor shall any testimony or evidence be admissible at a subsequent hearing, trial, or proceeding, judicial or administrative, to the effect that the public safety officer refused to take a polygraph examination."

█ It is clear that polygraph testing may not be required as a condition of continued employment when an employee is under investigation for suspected criminal activity. (*Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 942, 956 [227 Cal.Rptr. 90, 719 P.2d 660].) The Act also applies to employees who are involuntarily reassigned to lower paying positions after engaging in misconduct, because such transfers are per se disciplinary or punitive in nature. (*Baggett* v. *Gates*, *supra*, 32 Cal.3d 128, 141.)[3] It is less clear, however, whether the injunction against polygraph testing applies to employees who are not under investigation for criminal activity and who are seeking promotions rather than trying to avert demotions.

█ In a nutshell, the issue is whether peace officers who voluntarily seek promotions into sensitive assignments with the police department are "*compelled to submit to a polygraph examination against [their] will.*" § 3307.)

The City's polygraph requirement relates to peace officers' qualifications to be hired for certain positions within the police department. The League does not dispute that the employment positions in question are sensitive

---

[3]In *Binkley*, as in the *Baggett* case, the employee was demoted by, if not effectively terminated from, the Long Beach Police Department for engaging in "misconduct, misman-agement, and misjudgment." (16 Cal.App.4th at p. 1807.) The Act therefore applied to the procedures followed by the city when it enforced the discipline.

assignments where breaches of integrity are most likely to occur or would have the greatest impact. The polygraph is not used punitively; no dismissals, demotions, suspensions, reductions in salary, written reprimands, or transfers to worse, lower paying positions are contemplated by the City's use of the polygraph. (*White* v. *County of Sacramento*, *supra*, 31 Cal.3d at pp. 681-682.) The League does not argue that the polygraph is applied for purposes of punishment.

It is difficult to say that the polygraph testing is *compelled*. An act which is compelled is one that is commonly recognized as having been forced, without the possibility of denying or resisting.[4] It is even more difficult to say that the officers take the examination *against their will*. The officers who apply for positions in the affected divisions are forewarned of the polygraph requirement, yet choose of their own will to forge ahead notwithstanding this hurdle. No one is forcing the officers to apply for these jobs or to take the examination. The process is entirely volitional.

It appears from the legislative history of the Act that the League was instrumental in introducing and securing passage of the legislation. According to the position paper the League provided to the Senate Judiciary Committee, dated July 25, 1975, the Act "was introduced for this Association by Assemblyman Keysor in an attempt to rectify gross abuses of power by internal investigative departments within police departments throughout the State. . . ." The League's position paper compares some of the interrogation tactics to those used by storm troopers in World War II. In particular, the League complained of polygraph examinations used in the course of disciplinary proceedings which the officers were forced to repeat continuously "under threat of being fired." In support of its position, the League cited examples of police officers who sustained physical and emotional injuries when they were harshly interrogated during the course of internal investigations, kept in small rooms for long periods of time, not allowed to communicate with anyone, and not told what the charges against them were. Officers were also subjected to illegal searches and seizures, according to the League.

Thus, as the initiator of the Act, the League itself made it clear to the Legislature that the Act was primarily intended to address abuses connected with disciplinary investigations. The resulting legislation, including section

[4]The word "compel" is defined as meaning "to force or cause irresistibly: call upon, require, or command without possibility of withholding or denying . . . to impel or force to appear, come, or go: summon peremptorily . . . to domineer over so as to force compliance or submission . . . to obtain (a response) by force, violence, or coercion . . . ." (Webster's New Internat. Dict. (3d ed. 1981) p. 463.)

3307, makes abundant reference to disciplinary or punitive actions. Notably absent from the League's position paper is any discussion or criticism of the police department's techniques in sifting through applicants to find the best possible officers for its most sensitive assignments.

The discussion found in *Fraternal Order of Police Lodge No. 5.* v. *City of Philadelphia* (1988) 118 Pa. Commw. 132 [546 A.2d 137] is compelling because the facts are similar to those presented in the instant case.[5] There, the Pennsylvania appellate court considered the validity of a polygraph examination requirement for police officers wishing to transfer into the police department's special investigations unit. This unit was created to fight corruption in the police department and pursue major investigations involving organized crime, drugs, prostitution, gambling and vice. (546 A.2d at p. 138.) The state Supreme Court had previously ruled that the police department could not force its employees to submit to polygraph examinations or discharge employees who refused to be examined. (*Stape* v. *Civil Service Com'n of City of Philadelphia* (1961) 404 Pa. 354 [172 A.2d 161, 164].) Despite this rule, which is greatly similar to our own section 3307, the court in *Fraternal Order* held that no similar prohibition applies in the case of an officer who applies for a voluntary transfer to another unit of the police department. The court emphasized that the polygraph requirement under these nonpunitive circumstances was merely a precondition to acceptance into the special unit, like any other transfer requirement. (546 A.2d at p. 142.)

4. *Right to Privacy*

The League relies on *Long Beach Employees Assn.* v. *City of Long Beach,* *supra,* 41 Cal.3d 937, for the proposition that all polygraph questions constitute an impermissible invasion of privacy. The facts underlying the *Long Beach* case bear no comparison to those presented in the case at bar. The *Long Beach* case concerned a criminal investigation where theft was suspected, and the polygraph examinations were compelled under threat of termination, not taken by people seeking job promotions, as the case is here. The court described the issue presented as being "whether *involuntary* polygraph examinations impinge on an employee's right of privacy." (41 Cal.3d at p. 943, italics added.) In this limited context of a criminal investigation, the court made the statement that "polygraph examinations inherently intrude upon the constitutionally protected zone of individual privacy. The *coercive* collection of mental thoughts, conditions and emotions

---

[5]The ruling was affirmed by the Pennsylvania Supreme Court by summary disposition found at 523 Pa. 490 [567 A.2d 1388] (1990).

must be justified by a compelling government interest." (41 Cal.3d at p. 948, italics added, fn. omitted.) In this case, the government intrusion of which the League complains is invited: officers know of the polygraph requirement, yet agree to it by applying for positions in the affected divisions. Participation is not coerced or involuntary. Moreover, the evidence before us is undisputed that the questions used in the City's examinations relate solely to the tasks that would be performed by the candidates who seek to work in the affected divisions. Personal questions of an intimate nature, for example, are not asked.

Assuming for purposes of argument that the court's requirement of a compelling government interest applies to cases that do not involve the coercive collection of thoughts during the course of a criminal investigation, we can conceive of a compelling interest in permitting the government to ensure it hires the most dependable, incorruptible, and finest individuals to work in the affected divisions. ■ As the Supreme Court has acknowledged, the right of privacy does not necessarily prevail over the right of the public to an honest government. (*Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624].) The courts have held that police officers must yield some of the privileges enjoyed by the citizenry at large due to the public trust placed in these employees. (*Szmaciarz* v. *State Personnel Bd.* (1978) 79 Cal.App.3d 904, 916 [145 Cal.Rptr. 396]; *Forstner* v. *City etc. of San Francisco* (1966) 243 Cal.App.2d 625, 632 [52 Cal.Rptr. 621].) A compelling government interest may exist where individuals are applying for positions of public trust which pose unusual ethical demands and greatly affect public safety or security.

■ Without a doubt, the affected divisions do some of the most demanding and sensitive work in the police department, coming in contact with drug dealers, terrorists and members of organized crime groups. It is common knowledge that organized crime groups may offer bribes, and other illicit temptations are presented by the large sums of cash and drugs to which officers could be exposed. The existence of a "mole" or turncoat could jeopardize long-term covert drug, terrorist or organized crime investigations; it could endanger the lives of undercover officers participating in these operations; it could have a disastrous effect upon public safety and security if terrorists were able to learn from corrupt insiders the government's techniques for combating impermissible violent protest. The testimony established that polygraph examinations are considered a good way to screen out unsuitable candidates who lack integrity before they become members of the affected divisions.

CONCLUSION

We conclude that Government Code section 3307 does not apply to cases in which a polygraph examination is used to screen applicants voluntarily seeking transfer to sensitive assignments within the police department. It cannot be said that such examinations are "compelled . . . against [the employees'] will." (§ 3307.) Further, there is clearly a diminished expectation of privacy among applicants for positions in the affected divisions. The polygraph requirement applies to law enforcement officers whose work involves special demands beyond that faced even by rank and file officers. Applicants receive advance notice of this requirement, and the government has a compelling interest in ensuring the honesty and integrity the public expects will repose in these officers. Finally, the scope of the polygraph examination is limited to questions relating to the work the applicants wish to perform. In short, under the facts presented here, the polygraph examination required by the City for transfers to sensitive police assignments does not offend statutory or constitutional law.

DISPOSITION

The judgment is reversed. The trial court is directed to enter a new and different order awarding judgment in favor of the City of Los Angeles and against the Los Angeles Police Protective League. Costs, if any, to be borne by appellant.

Nott, J., and Brandlin, J.,* concurred.

A petition for a rehearing was denied July 12, 1995.

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.