[Civ. No. 6081. Fifth Dist. Jan. 28, 1983.]

WILLIAM ALEXANDER et al., Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE DELANO JOINT UNION HIGH
SCHOOL DISTRICT, Defendant and Respondent.

COUNSEL

Chain, Younger, Jameson, Lemucchi, Busacca & Noriega, Gary A. Ingle and James Yoro for Plaintiffs and Appellants.

Richard C. Anthony, Frank J. Fekete, Ronald D. Wenkart, Joanne A. Velman and Peter C. Carton for Defendant and Respondent.

OPINION

**WOOLPERT, J.**—This case concerns the decision of the governing board of the respondent high school district to reduce the number of its teachers and, at

the same time, to selectively retain teachers having Spanish speaking skills. In doing so, the district discharged appellant teachers whose employment had never before required bilingual ability. These teachers complain their dismissal was improper because they had been employed longer than those who were retained. The issue requires an examination of teacher tenure rights, "competency," and "skipping."

On March 3, 1980, the Delano Joint Union High School District Board of Trustees (hereinafter Board) adopted a resolution that certain specified services performed by certificated employees be reduced or eliminated for the 1980-1981 school year. Appellants (hereinafter Teachers) subsequently received notices of recommendation not to reemploy.

Upon Teachers' request, an administrative hearing was held. The administrative law judge issued a "proposed decision" which determined that respondent (hereinafter District) had acted arbitrarily and discriminatorily toward Teachers. After a special meeting, the Board issued a contrary decision and resolution which effected the dismissal of 21 employees, including Teachers.

Teachers filed a petition for writ of mandate in Kern County Superior Court requesting that the court set aside the Board's action and reinstate them as employees for the 1980-1981 school year. The court denied the petition and this appeal followed.

At the administrative hearing, the district superintendent read from the seniority list of the Delano Joint Union High School District and explained that certain junior employees were not dismissed because they could fill the district's language needs, possessed special credentials, or their area of service was not being reduced. It was estimated that more than half of the student population was of either Hispanic or Philippine descent; the major non-English languages spoken in the district were Spanish and the two major Philippine dialects, Tagalog and Pilipino. Although District had established a bilingual education program, there were no accurate statistics presented as to the degree to which students were deficient in speaking and writing English. Only one student could not speak English.

After notices of dismissal were sent to Teachers, the Board issued a resolution adopting criteria for determining the order of termination of certificated employees as between employees with the same first date of rendered paid service. "Language needs" and "competency" were among the criteria used in such a "tie-breaking" situation.

As to teachers who had different seniority dates, the superintendent first looked to see whether the employee had a certificate of competency in Spanish. Then, with respect to employees without certificates, he relied on assessments made by other bilingual personnel of each employee's ability to communicate in one of the needed languages. At the hearing, several employees who had received notices presented evidence that they were bilingual; as a result they were retained, even though not assigned to teach courses in the bilingual program.

In his proposed decision, the administrative law judge found the elimination and reduction of services was of "a particular kind of service" within the meaning of Education Code section 44955,[1] and that cause was established to reduce the number of certificated employees. However, he found District applied the "tie breaker" criteria of "language needs" to employees with *different* dates of first paid service, *contrary* to District's resolution, and did so arbitrarily and capriciously. He concluded that District arbitrarily failed to follow the seniority provisions of section 44955, and that it could not give notice to any of these employees.

The Board then held a special meeting to receive the report and an account of the hearing. During the meeting it was recommended that the termination notices be withdrawn as to the four employees who had presented evidence of being bilingual. The Board issued its resolution rejecting the administrative law judge's proposed decision and, with the exception of the four "bilingual" employees, ordered that the other noticed employees be terminated.

 Teachers contend that District did not use proper criteria in terminating them. We agree. Upon determining a need for a reduction in the number of permanent employees, a school district is required to comply with the lay-off procedures enumerated in section 44955. (*Thompson* v. *Modesto City High School Dist.* (1977) 19 Cal.3d 620, 628 [139 Cal.Rptr. 603, 566 P.2d 237].) Section 44955, with italics added, provides in pertinent part as follows:

"Whenever in any school year the average daily attendance in all of the schools of a district for the first six months in which school is in session shall have declined below the corresponding period of either of the previous two school years, whenever the governing board determines that attendance in a district will decline in the following year *as a result of the termination of an interdistrict tuition agreement as defined in Section 36403,* or whenever a particular kind of service is to be reduced or discontinued not later than the beginning of the following school year, and when in the opinion of the governing board of said district it shall have become necessary by reason of either of such

---

[1]All statutory references are to the Education Code.

conditions to decrease the number of permanent employees in said district, the said governing board may terminate the services of not more than a corresponding percentage of the certificated employees of said district, permanent as well as probationary, at the close of the school year; *provided, that the services of no permanent employee may be terminated under the provisions of this section while any probationary employee, or any other employee with less seniority, is retained to render a service which said permanent employee is certificated and competent to render.*

"'. . . . . . . . . . . . . . . . . . . .

"As between employees who first rendered paid service to the district on the same date, the governing board shall determine the order of termination solely on the basis of *needs of the district and the students* thereof. Upon the request of any employee whose order of termination is so determined, the governing board shall furnish in writing no later than five days prior to the commencement of the hearing held in accordance with Section 44949, a statement of the specific criteria used in determining the order of termination and the application of the criteria in ranking each employee relative to the other employees in the group. This requirement that the governing board provide, on request, a written statement of reasons for determining the order of termination shall not be interpreted to give affected employees any legal right or interest that would not exist without such a requirement.

"Notice of such termination of services either for a reduction in attendance or reduction or discontinuance of a particular kind of service to take effect not later than the beginning of the following school year, shall be given before the 15th of May in the manner prescribed in Section 44949, and services of such employees *shall be terminated in the inverse of the order in which they were employed,* as determined by the board in accordance with the provisions of Sections 44844 and 44845. In the event that a permanent or probationary employee is not given the notices and a right to a hearing as provided for in Section 44949, he or she shall be deemed reemployed for the ensuing school year." (Italics added.)

Thus, the statute provides that seniority determines the order of dismissals, and that as between employees with the same first date of paid service, the order of termination is determined on the basis of the needs of the district and its students. Senior employees are given "bumping" rights in that they will not be terminated if there are junior employees retained who are rendering services which the senior employee is certificated and competent to render. Conversely, as in this case, a district may move upward from the bottom of the seniority list, "skipping" over and retaining junior employees who are certificated and competent to render services which more senior employees are not. (*Moreland*

*Teachers Assn.* v. *Kurze* (1980) 109 Cal.App.3d 648, 655 [167 Cal.Rptr. 343]; *King* v. *Berkeley Unified School Dist.* (1979) 89 Cal.App.3d 1016, 1023 [152 Cal.Rptr. 782].)

■ On review of an administrative mandamus proceeding under Code of Civil Procedure section 1094.5, the independent judgment test must be applied when an agency's decision affects a fundamental vested right. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].) Tenured teachers possess vested rights in being retained. (*Turner* v. *Board of Trustees* (1976) 16 Cal.3d 818, 825 [129 Cal.Rptr. 443, 548 P.2d 1115].) Thus, the independent judgment test is applied in reviewing factual determinations of an administrative agency in terminating a permanent certificated employee. (*Campbell Elem. Teachers Assn., Inc.* v. *Abbott* (1978) 76 Cal.App.3d 796, 802 [143 Cal.Rptr. 281].) In the case of probationary employees, however, the less stringent substantial evidence test is applied, since their rights are not vested. (*Turner* v. *Board of Trustees, supra,* 16 Cal.3d at p. 824; *Campbell Elem. Teachers Assn., Inc.* v. *Abbott, supra,* 76 Cal.App.3d at p. 802.)

In the trial court's memorandum of decision, the court stated it had used the independent judgment test in reviewing the evidence. When the independent judgment test has been used below, an appellate court "need only review the record to determine whether the trial court's findings are supported by substantial evidence." (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242], citations omitted.)

"Seniority is not an inherent or constitutional right. Seniority itself confers no rights on employees but entitles them to preferential treatment only to the extent that a statute or collective bargaining agreement so provides. Seniority rights may be limited by subsequent legislation." (Ozsogomonyan, *Teacher Layoffs in California: An Update* (1979) 30 Hastings L.J. 1727, 1746, fns. omitted.) However, "respect for seniority rights" has been emphasized in the interpretation of tenure statutes. (*Gassman* v. *Governing Board* (1976) 18 Cal.3d 137, 145 [133 Cal.Rptr. 1, 554 P.2d 321].)

Administrative reclassification of teachers and its effect on tenure has long been a subject of concern. In one dissent it was thought to be a "device which may in hostile hands destroy the system of teachers' tenure. That system has raised immeasurably the dignity and professional competency of our teachers, and the legislative act which established it requires an interpretation which carries out, and not one which defeats its purpose." (*Fuller* v. *Berkeley School Dist.* (1934) 2 Cal.2d 152, 159 [27 Cal.Rptr. 109, 40 Cal.Rptr. 831] (dis. opn. of Langdon, J.).)

We must examine the words of section 44955 in order to determine the proper role of "program needs" in the retention of teachers. The two relevant portions of the section are: "[T]he services of no permanent employee may be terminated under the provisions of this section while any probationary employee, or any other employee with less seniority, is retained to render a service which said permanent employee is certificated and competent to render.

". . . . . . . . . . . . . . . . . . . . .

"As between employees who first rendered paid service to the district on the same date, the governing board shall determine the order of termination solely on the basis of needs of the district and the students thereof."

In a recent case it was held that a junior employee "having the ability to serve the *needs of a program* may be retained by the school district even though it may result that the senior employee lacking competence must be terminated." (*Moreland Teachers Assn.* v. *Kurze, supra,* 109 Cal.App.3d 648, 655, italics added.) The court observed it would be an absurdity to follow seniority alone and to "fire the needed employee upon reducing staff, only to thereupon be compelled to rehire him or someone else with the needed skill." (*Id.,* at p. 655.) The emphasis was on the program requirements rather than district or student "needs." *Moreland* concerned the skipping of administrators and of junior employees having special competence in particular traditional "services."

In this case many of the students attending the district high schools had Spanish-speaking backgrounds. Presumably, some of them had not fully developed their English speaking, reading and writing abilities. Teachers having the same seniority date might properly be retained or discharged depending upon their ability to communicate in Spanish, a generally applicable "need of the district and students."

The specific statutory language applicable to teachers with *different* seniority dates, referring to retention of senior permanent employees to render "service which said permanent employee is certificated and competent to render," was in the code *before* the sentence requiring consideration of "needs of the district and students" was added as a substitute for a former lottery method of determining the retention of teachers with the *same* first date of rendering paid service. We assume the Legislature presumed that teachers having the same seniority date would have to be "certificated and competent" to render the services for which they were employed (as in the provision relating to teachers with different dates), but wanted to provide broader criteria for retention in "tie-breaking" situations. Implicit is the assumption that the "certificated and competent" clause was to be more narrowly construed. It logically follows that

for teachers having different employment dates, "the needs of the district and students" is not a proper measure of priority.

A contrary construction would place all teachers in a single group measured by the sometimes vague needs of the district and pupils, as determined by the school board. To maintain the separate treatment of teachers with different seniority dates, we perceive the problem to be one of identifying "competency" in a traditional manner, which is concerned with courses and programs generally listed in job descriptions or course outlines. For example, within physical education may be found particular teaching requirements and competency which would vary from general sports to special classes for handicapped or retarded students. (*King* v. *Berkeley Unified School Dist.*, *supra*, 89 Cal.App.3d 1016, 1021-1022.) With respect to teachers having different seniority dates, "needs" are considered only in relation to the program requirements.[2]

District relies on the fact that it has a bilingual program, contending that "the California Attorney General, at 59 Ops.Atty.Gen. 73 . . . has specifically reviewed this question. He has concluded that bilinguality is a legitimate reason to retain junior employees and terminate senior employees lacking such competency where the district has a bilingual program." We are reminded that an opinion of the Attorney General is entitled to serious consideration. (*In re Quinn* (1973) 35 Cal.App.3d 473, 482 [110 Cal.Rptr. 881].) However, the reference is to teaching within specific statutorily prescribed bilingual programs which we mention briefly.

At the time the Board acted in this matter there were sections of the Education Code providing for the phasing-in of bilingual education programs. Among them were the Bilingual Education Act of 1972 (§ 52100 et seq.), the Bilingual Teacher Corps Program (§ 52150 et seq.) and the Bilingual-Bicultural Educa-

---

[2]This subject is discussed by Ozsogomonyan in her article, *Teacher Layoffs in California: An Update, supra,* 30 Hastings L.J. 1727, 1748-1749, footnotes omitted: "Skipping rights are more readily available to secondary schools and community colleges, where subject-matter credentials are now required. Elementary schools lack this flexibility because classroom teachers are often credentialed and competent to teach any grade. Those most often skipped in elementary schools are special education teachers, teachers with bilingual certificates or credentials, counselors, speech therapists, art and music teachers, and administrators.

"In some extreme cases, skipping because of special skills may not be permitted, such as when a skill is very narrowly defined and is not the actual academic subject in question. In one case, an ALJ refused to permit a district to retain a physical education teacher because of her skill in Afro-Asian dancing when more senior physical education teachers were being laid off. Similarly, a bilingual machine-shop instructor was not entitled to preference over more senior instructors lacking bilingual competency because bilingualism was not a requirement for the position. When employees have the same beginning date of paid service, however, a district may establish bilingualism as one of the criteria for determining which employees best meet the needs of the district and its students. Presumably, meeting affirmative action goals could also be one of the criteria for selecting among persons with equal seniority."

tion Act of 1976 (§ 52160 et seq.). In 1980 the Bilingual Teacher Grant Program (amending § 52150 et seq.) was enacted and other sections were amended, which we mention as they disclose legislative intent.

These sections call for teacher training and financial assistance to school districts. Inservice training programs are suggested, and later required. Section 52161 contained this mandate: "Therefore, the Legislature directs school districts to provide for in-service programs to qualify existing and future personnel in the bilingual and crosscultural skills necessary to serve the limited-English-speaking pupils of this state." Displaying an intent to protect presently employed teachers the Legislature provided: "School districts applying for these funds shall submit an assurance that personnel hired for this program only supplement and do not supplant district personnel." (§ 52168.) Finally, in 1980 the Legislature specifically assured continued tenure rights to those teachers who by the authority of waivers were permitted to "learn on the job."[3] In its closing reference to "other programs" the section appears to limit bilingual competency requirements to specially designed programs.

We therefore reach District's major premise: "As a practical matter, the term 'continuing language needs' of the District has a broader meaning than just 'bilingual' education programs. It is a criterion for evaluation of competency. The factors in determining which employees meet the District's 'continuing language needs' may vary with the district, depending on its own unique characteristics." We disagree. To permit such an exercise of discretion by a school board would risk the kind of uncertainty which the Legislature has sought to avoid in its recent enactment of bilingual education provisions which recognize the pressing need, but require careful management in achieving the goal of improved education to those who have difficulty in comprehending English. Employment of new teachers with bilingual ability and gradual, prospective amendment of job descriptions to include language skills, may be a proper means of creating district-wide bilingualism. However, presently

---

[3]"Teachers and teacher aids who are not bilingual-crosscultural teachers and aides, as defined by subdivisions (h) and (i) of Section 52163, shall not be permitted to teach in programs authorized pursuant to subdivision (a), (b), or, unless waived by the board, (c) of Section 52163, except as provided in Sections 52166 and 52178, or except as staffing requirements are waived by the board pursuant to subparagraph (B) of paragraph (1) of subdivision (c) of Section 52163. It is the intent of the Legislature that the provisions of Section 44955 shall apply to this section. However, in no case shall a school district dismiss a fully certificated teacher, who previously taught in the bilingual-bicultural program pursuant to a waiver granted under Section 52178, solely on the basis that such waiver has expired. Even if such person is unable to qualify for a bilingual credential or a bilingual-crosscultural certificate of competence, he or she shall retain his or her status, seniority, and rights as a probationary or permanent employee, as the case may be, for the purpose of serving as a monolingual teacher in other programs offered by the school district." (§ 52172.)

employed teachers hired as monolingual teachers, who are otherwise competent, may not be discharged under these conditions merely because more junior employees have achieved passing grades from a committee of bilingual teachers.

The testimony before the hearing officer illustrated the risks to tenure such informalities produce. Although District had established a bilingual program and it included bilingual courses in each of the instructional areas, no attempt was made to identify Teachers' relationship to those classes. There was no evidence that students with limited English ability were assigned to bilingual teachers. In fact, the only student known to have no English-speaking ability had for some time been assigned to a teacher who spoke only English, even though another teacher was fluent in the student's Philippine dialect. In determining priority, the superintendent testified that he used "competence" only in the tie-breaking situation. He "understood" that neither language needs nor affirmative action requirements were applied except as to teachers with the same date of service. However, the fact is that junior teachers were skipped because of language skills.

One of the Teachers sought to show that a teacher retained because of language skills was not *using* the language ability. Counsel for respondent objected that "[w]hether she uses the language ability or not is irrelevant." We disagree.

The teacher on the bottom of the seniority list who was skipped and caused the most controversy taught mathematics on an emergency credential. He was bilingual. His college major was physical education. Others with considerably more college units in math and teaching experience were discharged because they were not bilingual. This was an abuse of discretion.

The trial court concluded that District had correctly applied the seniority provisions of section 44955. The conclusion must be reexamined by the trial court based upon this opinion which in effect nullifies the Board's decision to skip the junior teachers who possessed Spanish language skills but were not employed to teach classes in the formal bilingual program. Some of the retained teachers were skipped solely because they possessed adequate Spanish language skills; others were retained for a combination of reasons. Because at least some of the persons skipped should have received the notices, a corresponding number of the most senior of the employees who were not reemployed must have been improperly given notices. The trial court must determine which of the Teachers suffered prejudicial error in this case.

The judgment is reversed and the trial court is hereby instructed to reconsider the petition.

Franson, Acting P. J., and Stanton, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.