[No. B086787. Second Dist., Div. Five. Jan. 22, 1996.]

JOSE RIVEROS, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Darryl Mounger and Diane Marchant for Plaintiff and Appellant.

James K. Hahn, City Attorney, Frederick N. Merkin and Leslie E. Brown, Assistant City Attorneys, for Defendants and Respondents.

## OPINION

**GODOY PEREZ, J.**—Jose Riveros appeals from the judgment denying his petition for writ of mandate to be reinstated to his job as a Los Angeles police officer. For the reasons set forth below, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

Appellant Jose Riveros (Riveros) was sworn in as a rookie member of the Los Angeles Police Department (the Department) on September 9, 1991. By all accounts, Riveros was an excellent and dedicated officer who showed an early commitment to a law enforcement career. Pursuant to section 109, subdivision (c) of the Los Angeles City Charter, Riveros would remain a probationary employee of the Department for 18 months.[1]

On November 3, 1992, a complaint against Riveros was lodged by 18-year-old Heather Stupnik, alleging that after Riveros arrested her the month before on drug charges, he struck up a personal relationship with her which culminated in sexual intercourse. Stupnik's allegations were investigated between November 20, 1992, and December 14, 1992. The investigation revealed that Riveros and his training officer, William Murphy, responded to a child abuse call made by Bonnie Ivy, Stupnik's mother. Ivy told Riveros and Murphy that Stupnik, a chronic drug abuser, was endangering the life of Stupnik's young child by keeping narcotics in the house. Riveros arrested Stupnik for drug possession. During the arrest and booking procedure, Riveros gave Stupnik his business card, telling her to call if she needed help.

Riveros was professional and courteous during this encounter. About one week later, Stupnik began leaving several messages for Riveros at the police station until Riveros returned her call. At this point, the accounts of what took place diverge. Stupnik contends that after a few "general" phone conversations, Riveros became flirtatious and asked to meet. Riveros picked her up at a Long Beach street corner, took her to a motel so they could talk, then had sex with her. Their lovemaking was not rape and was purely consensual, she told investigators. Riveros checked into the motel under a fictitious name. After she began calling Riveros at home, he changed his phone number and threatened to file a complaint about harassing phone calls. Feeling spurned, she wrote letters to Riveros with the intent to make him feel guilty. The Department's investigator noted that Stupnik admitted portions of the letters were not factual and were in part a "product of her imagination." The letters were later discovered by Stupnik's husband, who insisted that she file the complaint.

---

[1]All further charter references are to the Los Angeles City Charter unless otherwise indicated.

Riveros contended that his phone calls and meeting with Stupnik were intended to discuss ways she could overcome her drug use problem. Riveros admitted renting a motel room under a fictitious name and paying for that room in cash. He also admitted sitting on the bed with Stupnik, but contended he left when she made sexual advances to him, denying that they ever engaged in sexual intercourse.

The results of the investigation were included in a letter of transmittal by Riveros's commanding officer, Captain Timothy King. In analyzing Riveros's conduct, King noted that Riveros was involved in ongoing phone conversations—including calls to his home—with a known addict, that he did not inform anyone he was receiving such calls, that his off-duty meeting with a known addict and rental of a motel room for their meeting "would normally be suspicious to an officer" and that any "thinking, tactics conscious[] officer would have been fearful of being 'set-up' . . . ." Whether or not he had sex with Stupnik, King believed that Riveros "exposed himself to such personal risk, which subjected the Department to criticism, which was so inherently wrong that only the strongest discipline is applicable. Riveros, a good probationer, seems to have exposed a personality flaw, a deep rooted malignancy in his ability to make judgments that keep his professional position from benefiting his personal appetite." Riveros was contrite, expressed remorse and acknowledged his poor judgment. Based on his previously unblemished performance, Capt. King recommended a 15-day suspension.

After Commander Arthur Lopez learned that a drug user was involved, he recommended that Riveros be fired instead. Capt. King advised Riveros of the new recommendation and the paperwork was finally sent to Assistant Chief of Police Bernard Parks, who was the acting chief of police in the absence of Police Chief Willie Williams.

On February 19, 1993, Parks imposed a 22-day suspension based upon the following charge: "On or about October 3, 1992, you inappropriately turned an on duty official contact with arrestee H. Stupnik into an off duty social relationship." Riveros learned about the intended suspension on February 18, 1993, and began to serve it that day. He signed and was officially served the suspension papers on February 23, 1993. On February 24, 1993, Riveros left for San Francisco to work a part-time job while on suspension.

At 3 p.m. on February 23, however, Capt. King's temporary replacement was notified that Chief Williams had overturned the suspension and intended to fire Riveros. The Department tried unsuccessfully to reach Riveros in San Francisco. When Riveros returned from his trip four days later he found a notice posted on his door that he had been fired.

While the notice of termination is not in the record, Riveros contends and the Department does not dispute that the notice was on a form identical to the one used in imposing the original 22-day suspension. That form, from the Department's chief of police, is titled, "NOTICE OF TERMINATION OR SUSPENSION OF SWORN PROBATIONARY EMPLOYEE." Pursuant to charter section 109, subdivision (c), Chief Williams was terminating Riveros "pending any appeal to the Chief of Police." The second page of the form, in a section captioned "ADMINISTRATIVE APPEAL," advised that Riveros had five days from service of the notice to appeal the decision. The form contained instructions for service of the notice, including a provision that the completed original had to be filed with the Board of Civil Service Commissioners (the Board) of the City of Los Angeles (the City) at the end of the five-day appeal period if there were no appeal or immediately after the chief's final decision if an appeal were taken.

Riveros appealed the chief's decision and a hearing was held on March 23, 1993, before Capt. Joseph Curreri as hearing officer. That hearing was described by Curreri as a "liberty interest" hearing. After reading the charge to Riveros, Curreri told Riveros that he had the right to be represented by private counsel, a departmental representative, or both. Riveros was told he also had the right to produce witnesses on his behalf, cross-examine adverse witnesses and testify on his own behalf. Fifteen officers, many of them long-time veterans, testified that Riveros was an excellent and dedicated young officer who had shown one unfortunate lapse of judgment, urging that he be suspended instead of terminated. It was stipulated that 12 other officers who were not present would offer similar testimony if called. The Department called no witnesses.

Riveros testified that he gave Stupnik his business card because he believed he was supposed to hand one to every field contact he had. When Stupnik first called, she merely asked for advice, which he tried to give in a professional manner. When the calls continued, he explained that their relationship was only professional. After Stupnik persisted, including phoning Riveros at home, he threatened to report her for making harassing calls and changed to an unlisted home phone number. He did not report the phone calls because he did not believe he had done anything wrong. It was Stupnik's idea to meet at a motel because she had been kicked out of the house. Riveros rented a motel room at her request and told Stupnik it was the last thing he would do for her. He used a fictitious name to avoid embarrassing the Department.

Curreri said he at first believed the charge but, after hearing and considering all the testimony, was no longer convinced of Riveros's guilt. This

doubt was based on evidence of Riveros's strong work performance and that Riveros consistently tried to help people. He concluded that there was a preponderance of "equal if not greater evidence . . . to not resolve the allegation rather than to sustain the charge. . . ." He recommended that Chief Williams reevaluate the classification of the complaint as a charge of conduct unbecoming an officer and, if Williams did so, to instead impose a 22-day suspension. Curreri cautioned Riveros that his findings were not binding on Chief Williams, who was free to follow or disregard them.

On March 24, 1993, Curreri signed a form captioned "DECISION OF THE HEARING OFFICER ADMINISTRATIVE APPEAL HEARING AND ORDER OF THE CHIEF OF POLICE," making a recommendation in accordance with his statements at the hearing. Below the space for the hearing officer's decision was a section captioned "ORDER OF THE CHIEF OF POLICE." On April 14, 1993, Chief Williams signed this section, ordering Riveros's termination. Attached to the order was a typewritten page signed by Chief Williams which read: "I have reviewed the report of the Hearing Officer and weighed the evidence. Notwithstanding the recommendation, I have come to the conclusion that Police Officer I Jose Riveros should be REMOVED from his position as a Police Officer with the Los Angeles Police Department." The transcript of Riveros's appeal hearing was not prepared until May 10, 1993, however.

Riveros filed a notice and demand for reinstatement with the Board on April 14, 1993. The notice was made pursuant to charter section 112½, which governs the procedures for the termination of city employees who have passed their probationary period of employment. By letter dated May 11, 1993, the Board replied that it could not hear any appeal because Riveros was fired while still on probation.

On April 14, 1993, Riveros filed a petition for writ of mandate in the superior court, seeking reinstatement as a police officer. Named as respondents in the petition were the respondents on appeal here, the City and Chief Williams.[2] Riveros's operative first amended petition was filed on May 4, 1994. A writ of mandate was justified pursuant to Code of Civil Procedure section 1085, he alleged, because under charter section 109, subdivision (c) and the Department's own rules, the Department was obligated to cite specific reasons for his termination but failed to do so. Pursuant to the Department's rules and Government Code section 3304, subdivision (b), he alleged that he was entitled to an evidentiary hearing on those reasons, with

---

[2]The City and Chief Williams will sometimes be referred to collectively as "respondents."

the Department required to assume the burden of proof, produce evidence and make findings which were supported by substantial evidence.[3]

A writ of mandate pursuant to Code of Civil Procedure section 1094.5 was justified, he alleged for the same reasons, with the City and Chief Williams having no jurisdiction to fire Riveros because they did not follow the required procedures.

Points and authorities, with supporting evidence, were submitted by the parties to the trial court and oral argument was heard on June 6, 1994. Judge Robert O'Brien filed a statement of decision on July 12, 1994, finding that Riveros, as a probationary employee, could be fired at will and that the liberty interest hearing before Captain Curreri provided due process. Because Riveros had no protected property interest at stake, the City had no burden of proof to meet at the hearing. Further, while the need for some hearing technically brought the action within the purview of Code of Civil Procedure section 1094.5, that hearing and its outcome did not alter Chief Williams's power to fire Riveros at will. Judgment denying the petition was entered the same day.

Riveros makes the following principal contentions on appeal: (1) Chief Williams did not have the authority to overturn the earlier suspension imposed by Assistant Chief Parks as acting chief; (2) under charter section 109, subdivision (c), Williams was obligated to send a written statement of reasons for Riveros's termination to the Board before Riveros's probationary period expired on March 9, 1993. Since Williams did not do so until April 14, 1993, Riveros became a tenured police officer who could only be fired for good cause after a full and complete hearing before a Board of Rights; and (3) even if Chief Williams's decision was timely, charter section 109, subdivision (c) requires that reasons for the termination be given and that those reasons be supported by substantial evidence. Since the Department produced no witnesses adverse to Riveros at the appeal hearing and since Captain Curreri did not sustain the charge against Riveros, no such evidence was produced.

## STANDARD OF REVIEW

To the extent this appeal calls for the interpretation of statutes and charter provisions prescribing the procedures for terminating a probationary police

---

[3]Government Code section 3304 is part of the Public Safety Officers Procedural Bill of Rights Act, Government Code section 3300 et seq., which establishes certain minimal procedural protections for police officers subject to discipline or termination. Those provisions will be discussed in more detail *post.*

officer, it raises pure questions of law which we resolve de novo. (*Greenwood Addition Homeowners Assn.* v. *City of San Marino* (1993) 14 Cal.App.4th 1360, 1367 [18 Cal.Rptr.2d 350]; *Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50].) Because we conclude that Riveros was still a probationary employee at the time of his termination, to the extent his appeal calls for a resolution of disputed factual issues, we examine the record to see whether the trial court's findings are supported by substantial evidence. (*Alexander* v. *Board of Trustees* (1983) 139 Cal.App.3d 567, 572 [188 Cal.Rptr. 705].)

## DISCUSSION

### 1. *Riveros Was Still a Probationary Employee at the Time of Chief Williams's Final Order*

Charter section 109, subdivision (c) sets an 18-month probationary period for new police officers. It also provides, in relevant part: "At or before the expiration of the probationary period, the appointing authority of the department or office in which the candidate is employed may terminate him upon assigning in writing the reasons therefor to said board. Unless he is thus terminated during the probationary period his appointment shall be deemed complete. . . ." The appointing authority for the Department is the chief of police. (Charter § 206, subd. (a)(2).) The board to which the chief must assign his reasons in writing is the board of civil service commissioners. (*Schrader* v. *City of Los Angeles* (1937) 19 Cal.App.2d 332, 334 [65 P.2d 374], hereafter *Schrader*.)

The *Schrader* court construed charter section 109, subdivision (c) literally, holding that a probationary employee was not effectively discharged if the notice were sent to the Board after his probationary period expired. (19 Cal.App.2d at p. 334.) Riveros contends that because his probationary period would have expired March 9, 1993, Chief Williams's notice to the Board on April 14, 1993, was ineffective and he therefore became a tenured member of the Department entitled to a hearing before a Board of Rights.[4]

Respondents urge that we deem this contention waived since it was never raised below. (*Musquiz* v. *City of Huntington Park* (1986) 180 Cal.App.3d 876, 882-883 [225 Cal.Rptr. 817].) Because the contention raises a question of law based on undisputed facts, however, we will exercise our discretion and consider it. (*Resolution Trust Corp.* v. *Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510].)

---

[4]Charter section 202 provides that a tenured police officer can only be fired for good cause after being found guilty by a Board of Rights. At such a hearing, the accused officer in entitled to subpoena witnesses and documents and otherwise present a complete defense.

We conclude that Riveros's reliance on *Schrader* to interpret charter section 109, subdivision (c) is misplaced. The court in *Schrader* considered whether a Los Angeles city gardener was properly fired under that charter provision. The brief opinion was factually sparse, noting only that the superintendent of parks "attempted to discharge" Schrader during his six-month probationary period but did not assign written reasons for the discharge to the board until after the six-month period ran. Since charter section 109, subdivision (c) states that a probationary employee may be fired by assigning the reasons in writing to the Board, but that the appointment to the classified civil service of an employee "not thus discharged" during the probationary period becomes complete, Schrader's termination was ineffective. (*Schrader, supra,* 19 Cal.App.2d at pp. 333-334.)

No reported decision has since cited *Schrader* to construe charter section 109, subdivision (c). The court in *Randolph v. City of Los Angeles* (1977) 67 Cal.App.3d 201 [136 Cal.Rptr. 543] (hereafter *Randolph*), disapproved on another point in *Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 667, footnote 7 [150 Cal.Rptr. 250, 586 P.2d 564] considered whether the probationary period set forth in that charter provision could be extended due to employee absences. The petitioner in *Randolph* was a city ambulance attendant demoted five days after his six-month probationary period would have run. The employee had been absent 16 days due to industrial injuries.

Charter section 101 states that the Board is to make rules to carry out the purposes of the charter's civil service provisions in accordance with those provisions. Charter section 109, subdivision (c) provides that a probationary period not exceeding 18 months is "to be fixed by said rules." The *Randolph* court held that charter section 101 authorized the Board to define by rule the length of the probationary period. (*Randolph, supra,* 67 Cal.App.3d at p. 205.) Board rule 5.26 states the period of probation excludes "(a) The entire period or periods of any absence or absences whether on leave or not, except vacation and time off for overtime, if such period or periods, in the aggregate, exceed seven calendar days." Accordingly, the *Randolph* court held that the probationary period was extended by the petitioner's absences and he was fired while still on probation. (67 Cal.App.3d at pp. 205-206.)

 The same rationale applies here. Board rule 5.26 extends the probationary period by any absence greater than seven days.[5] The Department's notice of termination form includes a section captioned "EXTENSION OF

---

[5]Respondents contend that under *Randolph* the probationary period is not extended. Rather, it is "adjusted" to compensate for the probationary employee's absences in excess of seven

PROBATION PERIOD" which reads: "Civil Service Commission Rule 5.26 states that in the event a probationary officer is absent in excess of seven calendar days in the aggregate, except for vacation or time off for overtime, that officer's probationary period shall be extended by the entire period or periods missed. *Therefore, your probationary period may be extended as a result of absences relating to this matter.*" (Italics added.) We therefore hold that Riveros's probationary period was extended by his absences from the date of his notice of termination on February 24, 1993, to April 14, 1993, when Chief Williams signed the order of termination which was forwarded to the Board.[6]

Riveros relies on two decisions—*California School Employees Assn. v. Compton Unified School Dist.* (1985) 165 Cal.App.3d 694 [211 Cal.Rptr. 653] (hereafter *School Employees*) and *Currieri v. City of Roseville* (1970) 4 Cal.App.3d 997 [84 Cal.Rptr. 615] (hereafter *Currieri*)—to argue that *Randolph* was wrongly decided. In *School Employees,* two workers who were fired claimed their probationary periods had previously expired. Under Education Code section 45301, the probationary period was six months or 130 days of paid service, whichever was longer, as prescribed by school board rules, with the board empowered to exclude from this computation time off while on leave of absence. The defendant school board's rule tracked this language, setting a probationary period of six months or one hundred thirty actual days at work, whichever was longer, excluding time off for paid and unpaid leaves of absence.

---

calendar days. We will not quibble with this distinction, but choose to label the effect of absences under Board rule 5.26 as an extension of the probationary period since that is the language used in *Randolph*.

[6]We asked for supplemental briefing on this issue and Riveros concedes in his brief that if Board rule 5.26 applies here, then his probationary period was in fact extended by the period between his relief from duty and Chief Williams's April 14 order. The record does not disclose whether Riveros had any other absences which would have tolled the probationary period any earlier and, for discussion's sake only, we will assume he did not. Riveros alleges that his termination took effect February 24, even though he also admitted that he began serving his suspension on February 18, 1994. Even accepting February 24 as the date of his first absence, there were still a full 14 calendar days until his probation would have expired on March 9, 1993, and under Board rule 5.26, any absences after seven calendar days extended the probationary period.

However, Riveros contended for the first time during oral argument that his termination never became effective since there was no evidence in the record that Chief Williams in fact ever transmitted his written statement of reasons to the Board. We deem this argument waived because it was never raised in Riveros's briefs. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 41 [210 Cal.Rptr. 762, 694 P.2d 1134].) This argument also contradicts Riveros's opening brief, in which he stated that Chief Williams did transmit his statement of reasons to the Board. We deem these statements a concession by Riveros that Williams did so. (*Franklin v. Appel* (1992) 8 Cal.App.4th 875, 893, fn. 11 [10 Cal.Rptr.2d 759].)

The school board argued that the employees' paid vacation time was also properly included to extend their probationary periods. The Court of Appeal rejected this contention, focusing on the interplay between Education Code section 45301 and other provisions which statutorily granted school employees the right to paid holidays and vacations. (Ed. Code, §§ 45203, 45197, subd. (a).) The school board's rule conflicted with all three provisions, which the court construed together as calling for a probationary period of 130 days of "paid status." (*School Employees*, *supra*, 165 Cal.App.3d at pp. 698-701.)

*Currieri* involved the calculation of the probationary period for two discharged police officers. The Roseville City Charter directed the city council to enact by ordinance "a period of probation not to exceed one year . . . before . . . appointment is made permanent" for municipal employees. The ordinance which was adopted, however, provided that the change from probationary to permanent status could only occur after a written statement authorizing the change in status had been filed. The plaintiff police officers were fired more than one year after their probationary period started but before the required statement had been filed.

The Court of Appeal held that the city ordinance was unlawful since it contradicted the express language of the city charter, which only authorized a probationary period of one year, and which the court interpreted as automatically conferring permanent status on any police officer not discharged during the probationary period. (*Currieri*, *supra*, 4 Cal.App.3d at pp. 1000-1001.)

Based on these two decisions, Riveros contends that the *Randolph* rule creates a similar conflict with charter section 109, subdivision (c), which provides for a probationary period not to exceed 18 months and which requires that the chief's written reasons for discharge be sent to the Board within that time period.

The conflicts between statute and city charter present in *School Employees* and *Currieri*, however, were not present in *Randolph* and are not present here. While the Education Code's grant of paid holidays and vacation time precluded use of paid vacation time to extend the probationary period in *School Employees,* Board rule 5.26 specifies that vacation time will *not* extend that period. The city charter in *Currieri* did not include a grant of authority to the city council to fix the probationary period, but instead directed the council to set a one-year limit on that period.

In contrast, charter section 109, as the *Randolph* court observed, calls for a probationary period to be fixed by the Board's rules, thereby granting the

Board authority to define how that period will be measured. (*Randolph, supra,* 67 Cal.App.3d at p. 205.) This extension of the probationary period due to absences over seven calendar days "is not unreasonable in view of the purpose of the probationary period, which is to provide management with a reasonable opportunity to observe and evaluate an employee's performance on the job before according him or her the status of a permanent employee. [Citations.]" (*Ibid.,* cited with approval by *School Employees, supra,* 165 Cal.App.3d at p. 699.)[7]

The charter provisions were not intended to cover the entire civil service system but only to establish policies and standards to be carried out in detail by the Board through it rules-making power. As such, the Board was empowered to adopt reasonable rules and regulations that it deemed necessary to the efficient exercise of its powers expressly granted by the charter. Although authority to exclude lengthy absences from the prescribed probationary period was not expressly conferred by the charter, the authority is implied in the Board's broad discretionary power under charter sections 101 and 109, subdivision (c) to administer and enforce the civil service laws and to fix the probationary period by its rules. (See *Baker* v. *Wadsworth* (1970) 6 Cal.App.3d 253, 261 [85 Cal.Rptr. 880].) Rules promulgated by such a board will bot be interfered with as long as they are reasonable and not capricious. (*Water* v. *Civil Service Board* (1955) 133 Cal.App.2d 733, 736 [284 P.2d 919].)

This rule applies with special force to probationary police officers, since to hold otherwise would tie the Department's hands in terminating such officers involved in some misconduct shortly before their probationary term expires. As we explain, *post,* probationary police officers fired for misconduct have the right to a limited, name-clearing hearing before their termination becomes effective. The Department gives its officers five days to request such a hearing, which involves the presentation of witnesses and

---

[7]Riveros also attempts to distinguish *Randolph* based on the first paragraph of Board rule 5.26. That paragraph sets forth the probationary period for police officers, firefighters and paramedics, stating that in computing their probationary periods, time spent on restricted duty as required by a physician shall be excluded. The paragraph then sets the probationary period for managers and those hired in all other classes. It concludes with the sentence: "In computing the period of probation, the following shall be excluded: . . . ," which leads directly to subdivision (a) and the exclusion of any absences more than seven days.

Riveros appears to contend that this final sentence and the concomitant exclusion of all absences over seven days applies only to managers and all other employees since it immediately follows the provisions which set their probationary periods. Both the plain meaning and a common sense interpretation of this provision refute this contention. Nothing in the final sentence of this paragraph precludes its application to police and other safety and rescue officers. Nor can we conceive of any sound reason for making such a distinction between those officers and all other city employees.

other evidence. It was only after this hearing that Chief Williams provided the Board with his written statement of reasons for Riveros's termination and it was only then that the termination became effective under charter section 109, subdivision (c). When a probationary officer is given notice of termination near the end of his probationary term, it may be impossible to convene such a hearing and have the chief deliver his statement of reasons to the Board before that term expires.[8] As a result, miscreant probationary officers would achieve tenure and all its concomitant protections merely because their misconduct occurred or was not dicovered until late in their probationary term.

This appeal requirement did not exist when *Schrader* was decided more than 58 years ago. The facts of *Schrader* are few and do not tell us what attempts were made to fire the petitioner before his probationary period ended. Neither did that decision discuss or consider the applicability of Board rule 5.26. An opinion is not authority for propositions not considered. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) Accordingly, we do not believe *Schrader* controls here and choose to follow *Randolph* instead. Since Riveros's absences after February 24, 1993, extended his probationary period, his probationary period had not yet expired at the time Chief Williams transmitted to the Board his written reasons for firing him.[9] Accordingly, his termination became effective within the probationary period.

### 2. Riveros's Termination Was Proper Under Charter Section 109

■ Charter section 109, subdivision (c) provides that the appointing authority, in this case Chief Williams, may fire a probationary employee by assigning in writing the reasons for that decision to the Board. The court in *Puckett* v. *City and County of San Francisco* (1962) 208 Cal.App.2d 471 [25 Cal.Rptr. 276] (hereafter *Puckett*) interpreted a similar provision from the

[8]In this case, for instance, Stupnik's complaint was not filed until a few weeks after the incident. An investigation did not begin until more than two weeks after the complaint was filed and did not conclude for nearly three weeks. A decision on whether and how to discipline Riveros was not made for two more months and an appeal hearing was not convened for yet another month.

[9]Riveros's reliance on the Department's "Special Order No. 14" does not alter our conclusion. That order "revises the procedures for completing a [complaint] . . . which could result in the discipline of a probationary employee." It also refers to the notice of termination as a "tentative decision" while the notice of termination itself, in describing the procedures for service of the notice, refers to the chief's "final" decision after any appeal. Regardless of whether Chief Williams's February 23 decision was in any sense "tentative," Riveros's probationary period was still extended by his absences after February 24 and he was therefore still on probation when Williams signed the "final" order on April 14.

San Francisco charter and concluded that the police chief "cannot act arbitrarily or capriciously [in firing a probationary officer] but instead must act reasonably and upon substantial evidence." (*Id.* at p. 475.)[10] Riveros contends that *Puckett* controls here, mandating the existence of reasons for his termination which were supported by substantial evidence. We believe that *Kestler* v. *City of Los Angeles* (1978) 81 Cal.App.3d 62 [146 Cal.Rptr. 61] (hereafter *Kestler*) controls and sets the parameters for the applicability of *Puckett.*

The court in *Kestler* applied charter section 109, subdivision (c) in affirming the termination of a probationary police officer based on one incident of misconduct: driving while highly intoxicated following a fellow officer's retirement party.

Though the *Kestler* court did not discuss *Puckett,* it did discuss the broad discretion which charter section 109 grants the police chief in deciding whether to fire a probationary officer: "It is of the essence of a probationary employment that the employee is on trial for the probationary period. Observation of the employee during that period may disclose things about his character, personality and efficiency not discoverable at the time of [his] original employment. Those matters involve more than objectively provable acts of misconduct. They involve matters requiring expert evaluation by the employee's superior and supervisory officers. The citizens of Los Angeles have determined, by [charter] section 202, that if a probationary police officer has not been found unsatisfactory until after his probationary period has passed he shall not thereafter be dismissed except for misconduct that is susceptible of proof at a hearing and that the penalty for acts so proven shall be determined by an independent agency—the board of rights. But the citizens have reserved, in section 109, the essentials of probationary evaluation and have left to the chief of police the right and power to weigh not only proven acts of misconduct but more subtle matters of character and judgment, and to act on his expertise in deciding whether the probationer should attain the secure status of a permanent employee." (*Kestler, supra,* 81 Cal.App.3d at p. 65.)

The officer in *Kestler* contended that the following facts showed the chief abused his discretion in firing him: he had many commendations and the incident was an isolated one which occurred off-duty. The court rejected that

---

[10]Section 148 of the San Francisco charter provided, in relevant part, that "[a]t any time during the probationary period the appointing officer may terminate the appointment upon giving written notice of such termination to the employees and to the civil service commission specifying the reasons for such termination." (*Puckett, supra,* 208 Cal.App.2d at p. 474.)

argument, holding that the chief was free to determine that "even a single act of drunk[en] driving by a police officer evidenced such bad judgment as to make him a poor risk for further police duties. [¶] . . . The chief, relying on his professional expertise, exercised the discretion granted him by section 109 to determine whether to risk some additional evidence of poor judgment—the next time while acting as a police officer. We cannot say that the chief abused his discretion in making that decision." (81 Cal.App.3d at pp. 66-67, fn. omitted.)

We do not believe that *Puckett*'s interpretation of the similarly-worded San Francisco charter provision deprives the chief of the broad discretion described in *Kestler*. While the chief must have some reason for firing a probationary officer which is supported by some evidence, he still possesses the essential powers of probationary evaluation. The kinds of acceptable reasons the chief must state to the Board are as broad as his discretion under *Kestler*. So long as he articulates a reason and acts within those bounds and his decision is supported by some credible evidence, he has met his obligations under charter section 109, subdivision (c).[11] To the extent *Puckett* can be read as imposing any greater requirements, we disagree with the decision and choose not to follow it.

Chief Williams did state his reason for terminating Riveros—his development of an off-duty relationship with an on-duty arrestee. While Riveros denied that he and Stupnik ever had sex, and portrayed his involvement as nothing more than a misguided but sincere desire to help her, we cannot ignore Captain King's critical evaluation of Riveros's admittedly poor judgment in having off-duty contacts with a known drug addict and meeting that addict in a motel room which Riveros rented under a fictitious name. We presume Chief Williams did not ignore that evaluation either. If a one-time drunken driving incident justified the discharge in *Kestler,* then Riveros's one-time serious lapse in judgment justified the same result in this matter. The evidence to sustain this charge was amply documented by the investigative report, including Riveros's admission that he did develop an off-duty relationship with Stupnik.[12]

---

[11]Substantial evidence must be reasonable, credible and of solid value. (*Rivard* v. *Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 414 [210 Cal.Rptr. 509].) It is defined as evidence which a fair and reasonable mind could accept as adequate to support a conclusion. (*Chappell* v. *Palmer* (1965) 236 Cal.App.2d 34, 36-37 [45 Cal.Rptr. 686].)

[12]We view as a red herring Riveros's contention that Chief Williams's April 14, 1993, order could not have been based on an evaluation of the evidence since the decision was made before the transcript of the appeal hearing was prepared. The April 14 order had nothing to do with the decision to terminate Riveros in the first instance, which was made in February 1993.

### 3. Applicability of the Police Officers "Bill of Rights" Act

■ Riveros contends that before he could be fired, he was entitled under Government Code section 3304 to an evidentiary hearing at which the Department bore the burden of proof to sustain the charges against him.[13] Section 3304 is part of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq., hereafter the Act). The Act provides a catalogue of basic rights which must be afforded all peace officers by the public entities which employ them.[14] It was designed to avoid the adverse consequences of labor unrest and strikes by peace officers by maintaining stable employment relations between those officers and their employers. (§ 3301; *Binkley* v. *City of Long Beach* (1993) 16 Cal.App.4th 1795, 1805 [20 Cal.Rptr.2d 903], cert. den. __ U.S. __ [127 L.Ed.2d 653, 114 S.Ct. 1301], hereafter *Binkley*.)

While his argument on this point is confusing, we believe Riveros has improperly blended charter section 109—which controls the reasons and procedures for terminating a probationary police officer—with provisions of the Act, which only provides a limited right of appeal from such a termination. As we make clear, the rights and obligations imposed by charter section 109, subdivision (c) are separate and apart from those established by the Act.

Whether the chief acted properly in rejecting the hearing officer's recommendations after the appeal hearing will be discussed *post*.

We also reject Riveros's assertion that the trial court erred in ruling that respondents had no burden of proof to satisfy in support of its stated reason for firing him. The trial court's statement of decision held that respondents had no such burden in connection with the posttermination appeal hearing under Government Code section 3304, a proposition which we also consider *post*. In regard to the discharge itself, the court stated that it was "controlled" by charter section 109, subdivision (c) and that Chief Williams exercised his discretion under that provision. The court made no direct finding that substantial evidence supported the discharge, however. Since Riveros does not contend and the record does not disclose that he ever brought this omission to the court's attention, we will presume that all factual findings necessary to the judgment were made by the trial court, leaving as the sole issue for determination whether substantial evidence supports those implied findings. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1135 [275 Cal.Rptr. 797, 800 P.2d 1227].) As noted, there was ample evidence to support the implied finding that Chief Williams did state reasons for the discharge which were supported by substantial evidence.

[13]All further statutory references are to the Government Code unless otherwise indicated.

[14]In summary, the Act: (1) secures for peace officers the right to engage in political activity when off duty and out of uniform and to seek election to or serve as a member of a local school board (§ 3302); (2) establishes certain protections which must be provided officers during interrogations which could lead to punitive actions (§ 3303); (3) gives the right to review and respond in writing to adverse comments entered in an officer's personnel file (§§ 3305, 3306); (4) provides that officers may not be required to undergo polygraph examinations (§ 3307); (5) prohibits, except under limited circumstances, the search of an officer's locker or personal storage spaces (§ 3309); (6) limits the circumstances under which an officer can be forced to disclose his personal finances (§ 3308); (7) gives officers the right to an administrative appeal following any punitive action (§ 3304); and (8) protects them against retaliation for the exercise of any rights conferred by the Act (§ 3302).

At issue here is section 3304, which provides, in relevant part: "(b) No punitive action . . . shall be undertaken by any public agency without providing the public safety officer with an opportunity for administrative appeal." The right to such a hearing arises from the due process protections of the Fourteenth Amendment to the United States Constitution. Even though he was only a probationary officer, because Riveros's discharge was based on an allegation of misconduct, which could stigmatize his reputation and make it difficult to obtain other law enforcement jobs, a protected "liberty" interest was implicated, requiring that he be afforded the name-clearing appeal provided by section 3304, subdivision (b) before his termination became effective. (*Phillips* v. *Civil Service Com.* (1987) 192 Cal.App.3d 996, 1001 [237 Cal.Rptr. 751]; *Lubey* v. *City and County of San Francisco* (1979) 98 Cal.App.3d 340, 345-346 [159 Cal.Rptr. 440]; *Binkley, supra,* 16 Cal.App.4th at p. 1807; *Swift* v. *County of Placer* (1984) 153 Cal.App.3d 209, 216, fn. 6 [200 Cal.Rptr. 181]; *Fleisher* v. *City of Signal Hill* (9th Cir. 1987) 829 F.2d 1491, 1494-1495.)

The limited purpose of the section 3304 appeal is to give the peace officer a chance to establish a formal record of the circumstances surrounding his termination and try to convince his employer to reverse its decision, either by showing that the charges are false or through proof of mitigating circumstances. (*Binkley, supra,* 16 Cal.App.4th at p. 1806.) This is very nearly the same purpose for the hearing mandated by due process requirements, which must afford the officer a chance to refute the charges or clear his name. (*Lubey* v. *City and County of San Francisco, supra,* 98 Cal.App.3d at pp. 346-347; see also *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 138, fn. 13 [185 Cal.Rptr. 232, 649 P.2d 874] [section 3304 appeal is to some extent coextensive with requirements of due process].)[15]

The Act was not, however, "intended to abrogate the powers granted charter cities under article XI, section 5 of the California Constitution [citation], including the right to terminate a peace officer's employment at will, without a showing of 'just cause.' [Citations.]"[16] (*Binkley, supra,* 16 Cal.App.4th at p. 1806.) "Just because the . . . Act provides certain procedural safeguards and allows a probationary employee to establish a formal

---

[15]It is arguable that Riveros was entitled to no such hearing at all, since his admission of the substantial truth of the charges against him eviscerates any claim that his due process rights would be violated absent a name-clearing appeal. (*Lukin* v. *City and County of San Francisco* (1986) 187 Cal.App.3d 807, 813-814 [232 Cal.Rptr. 1]; *Kestler, supra,* 81 Cal.App.3d at p. 66.) Even so, we will proceed to examine whether Riveros's posttermination hearing satisfied his rights under section 3304, subdivision (b).

[16]Under this so-called "home rule" provision, the state Constitution grants charter cities plenary authority to provide for the "compensation, method of appointment, qualifications, tenure of office and removal" of their employees. (Cal. Const., art. XI, § 5, subd. (b)(4).)

record of the circumstances surrounding his termination does not mean [the Department] cannot terminate its probationary peace officers without cause." (*Barnes* v. *Personnel Department* (1978) 87 Cal.App.3d 502, 505-506 [151 Cal.Rptr. 94].)[17]

In short, section 3304, subdivision (b) of the Act has no application to why respondents fired Riveros. (*Baggett* v. *Gates, supra,* 32 Cal.3d at p. 138.) It only establishes his right to a posttermination appeal of some kind. (*Gray* v. *City of Gustine* (1990) 224 Cal.App.3d 621, 630 [273 Cal.Rptr. 730] [probationary police officer terminable without cause is covered by the Act and entitled to an administrative appeal after termination].) In so holding it is important to note that we are only concerned with the protections which the Act provides probationary police officers under section 3304, subdivision (b). Our decision does not concern the applicability of other provisions of the Act and does not address the interpretation of section 3304 in regard to tenured peace officers. (See, e.g., *Crupi* v. *City of Los Angeles* (1990) 219 Cal.App.3d 1111, 1120-1121 [268 Cal.Rptr. 875].)

Nothing in either charter section 109 or section 3304 of the Act requires that a probationary police officer be given a pretermination hearing at which the Department must produce substantial evidence to support the reasons for the discharge. In fact, such a requirement would contradict the applicable case law. (*Lubey* v. *City and County of San Francisco, supra,* 98 Cal.App.3d at p. 345 ["It is settled law that a probationary (or nontenured) civil service employee, at least ordinarily, may be dismissed without a hearing or judicially cognizable good cause."].) It would also produce the absurd result of probationary police officers receiving very nearly the same protections as tenured police officers. (*Kestler, supra,* 81 Cal.App.3d at pp. 64-65 [under charter section 202, tenured police officers in the civil service must receive a full and fair pretermination hearing and can only be fired upon a showing of good cause; the rights of probationary officers under charter section 109 must be construed in reference to the rights conferred by charter section 202 and, under charter section 109, the chief is given the essential powers of probationary evaluation].)[18]

---

[17]That Riveros's appeal hearing was intended to satisfy these requirements is made clear by Captain Curreri's designation of the procedure as a "liberty interest hearing" and his warning that Chief Williams was free to disregard his recommendations.

[18]Neither are we persuaded by Riveros's abstruse attempt to convert the section 3304 liberty interest hearing into an adjudicatory hearing conferring the full panoply of civil service procedural protections by virtue of the Department's Special Order No. 14 and its reference to a "tentative" versus a postappeal "final" decision. Nothing in the record even hints that a hearing under Special Order No. 14 is anything other than the liberty interest hearing mandated by section 3304 and due process concerns. Instead, Curreri advised Riveros

Riveros's contention that the appeal hearing required under section 3304, subdivision (b) placed certain procedural and substantive burdens on respondents is incorrect. The *Binkley* court considered and rejected the contention that the employer bears the burden of proof at such a hearing. Instead, the discharged probationary employee enjoys only a limited right to establish a formal record of the circumstances surrounding his termination and to convince the employer to reverse its decision by demonstrating the falsity of the charges which led to the termination or through proof of mitigating factors. (*Binkley, supra,* 16 Cal.App.4th at p. 1809.)[19]

Chief Williams's choice to stand by his decision without reviewing the transcript of the appeal hearing does not alter our conclusion. Even though Riveros was entitled to refute the charges and try to convince the chief to reverse his decision, section 3304, subdivision (b) does not affect his right to terminate probationary officers without good cause. (*Barnes* v. *Personnel Department, supra,* 87 Cal.App.3d at pp. 505-506.) As discussed, *ante,* the decision to fire Riveros did comport with charter section 109, subdivision (c), and nothing in the charter or section 3304 provides a right to have that decision reversed. Similarly, nothing in the applicable law required the chief to do anything other than provide the liberty hearing which due process and section 3304 compel. Respondents did so.

The trial court's finding that the hearing comported with section 3304, subdivision (b) and applicable due process requirements was therefore correct. (*Binkley, supra,* 16 Cal.App.4th at p. 1807 [due process requires at a minimum that the employee be given a chance to refute the charges and clear his name].)

### 4. *Chief Williams Was Free to Override Riveros's Initial Suspension*

█ Finally, we dispose of Riveros's contention that the 22-day suspension imposed by assistant chief Parks as the acting chief was a final decision which Chief Williams could not reverse. Riveros contends that the initial decision to suspend him became effective once he acquiesced in and began to serve his suspension. His reliance on *In re Governorship* (1979) 26 Cal.3d

---

that it was a "liberty interest" hearing. Further, the fact that Williams was free to disregard the outcome of the appeal hearing, as Curreri advised Riveros, is in accord with the liberty interest function of a section 3304 hearing: to provide an opportunity to refute the charge or offer evidence of mitigating circumstances so the employer can decide whether to reverse its decision. (*Binkley, supra,* 16 Cal.App.4th at p. 1806.)

[19]In fact, the Department's procedures granted Riveros a right which section 3304, subdivision (b) does not confer: to cross-examine adverse witnesses. (*Binkley, supra,* 16 Cal.App.4th at p. 1809.)

110 [160 Cal.Rptr. 760, 603 P.2d 1357], to support this contention is misplaced. The court in that decision held that judicial appointments made by the Lieutenant Governor, as acting Governor in the absence of the Governor, could be revoked by the Governor because they had not become effective. (*Id.* at pp. 120-122.) That holding was based on interpretations of a chief executive's power dating back to *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137 [2 L.Ed. 60], and has no application here.

Nothing in charter section 109, subdivision (c) or any other statutory or charter provisions restricts the police chief's ability to reverse an initial decision to discipline a probationary employee and instead terminate him. In fact, that power is consonant with the broad authority granted the chief in dealing with probationary officers. To hold otherwise would unduly restrict those powers. As respondents point out, it could also lead to absurd results, such as where the acting chief had imposed no discipline at all for an offense which the chief deemed worthy of sanction, or where an initial decision to discipline must be supplanted by termination when new and more egregious facts come to light.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Each party to bear its own costs on appeal.

Grignon, Acting P. J., and Armstrong, J., concurred.

A petition for a rehearing was denied February 20, 1996, and the opinion was modified to read as printed above.